# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN-MICHAEL KUCZYNSKI, Ph.D., | Case No. _____ |
| Plaintiff, | **VERIFIED COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| UBS FINANCIAL SERVICES INC., | |
| Defendant. | |

Plaintiff John-Michael Kuczynski, Ph.D., appearing *pro se*, alleges as follows:

## NATURE OF THE ACTION

1. This is an action against UBS Financial Services Inc. ("UBS"), the broker-dealer and custodian holding approximately $9 million in trust assets in which Plaintiff holds a vested one-third ownership interest. The claims are conversion, breach of custodial duty, and aiding and abetting breach of fiduciary duty, with equitable relief in the form of a constructive trust and an accounting.

2. The central fact of this case is simple and documented: for over eleven consecutive months after the settlor's death on February 1, 2025, the Trust accounts sat entirely unfrozen at UBS, and the trustee, Carolina Reid, distributed not one dollar to Plaintiff or to any other beneficiary. Not one cent in over eleven months on accounts that were open, unrestricted, and held approximately $9 million. The Trust instrument mandates outright distribution. The trustee ignored it.

3. Then, approximately one year after the settlor's death, Plaintiff contacted UBS and stated his intention to litigate and seek Carolina Reid's removal as trustee. Within weeks, UBS froze the accounts.

4. Within days of the freeze, Carolina Reid's lawyers filed verified pleadings in three separate courts swearing that Plaintiff's conduct had caused the freeze and that the freeze was the reason no distributions had been made. To support that narrative, they submitted an undated letter on UBS letterhead — purportedly from UBS's Subpoenas, Levies and Garnishments Group — as genuine "correspondence from UBS."

5. The narrative is a lie, and it is self-refuting. No freeze can cause over eleven months of non-distribution that preceded it. The non-distribution came first, ran for over eleven months on fully unrestricted accounts, and the freeze narrative was manufactured after the fact to excuse it and to shift blame to Plaintiff.

6. The instrument used to carry that narrative — the undated "UBS" freeze letter — was not authored by UBS. A forensic examination by David K. Shelton, a licensed North Carolina

forensic document examiner, confirmed on July 30, 2026 that both versions of the letter filed of record are not authentic and were copied or modified from another document. The embedded authorship metadata of the version filed April 22, 2026 identifies the author as "Purdie, Terry" — a legal assistant at the trustee's own law firm, Offit Kurman, P.A. — created in Microsoft Word for Microsoft 365 on January 16, 2026. No version of the letter, in any court, bears a UBS author. UBS has been on detailed written notice of this since April 27, 2026 and has neither verified nor disavowed the instrument.

7.  UBS's role in this fraud is not passive. UBS accepted a conflicted pre-death transfer of $7 million under a power of attorney naming its own employee — the trustee's daughter, Violet Reid — as successor attorney-in-fact, without any documented conflicts review. UBS then liquidated the entire portfolio in a single event generating $473,533.05 in avoidable capital gains taxes, fragmented the account into six undisclosed accounts, wired $70,582.79 of Trust corpus directly to the trustee's litigation counsel, and paid $467,719.27 in estate taxes from Trust assets — all while providing Plaintiff's prior attorney a stale accounting that concealed every one of these transactions.

8.  Now UBS proposes to release approximately $9 million to a trustee who has sworn under oath that she will charge Plaintiff's entire one-third residuary share for the cost of the litigation she provoked, and who has declared that no distributions can be expected in the foreseeable future. UBS confirmed in writing on July 26, 2026 that it intends to follow the Maryland court's release order — an order obtained on the strength of the fabricated freeze letter. Plaintiff files this action and a simultaneously filed emergency motion for a temporary restraining order to stop that release.

**PARTIES**

9.   Plaintiff John-Michael Kuczynski, Ph.D., is a natural person residing at 746 Stoney Point Road, Fayetteville, North Carolina 28304. He is a son of the settlor, Jane Casey Hughes, and a one-third residuary beneficiary of the Jane Casey Hughes Revocable Trust.

10. Defendant UBS Financial Services Inc. ("UBS") is a corporation organized under the laws of Delaware, with its principal place of business at 1285 Avenue of the Americas, New York, New York 10019. UBS is a registered broker-dealer and investment adviser. UBS has been and remains the custodian of the Trust's assets since January 2025.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of North Carolina. UBS is a citizen of Delaware and New York. The amount in controversy exceeds $75,000, exclusive of interest and costs, as the disputed res is approximately $9 million.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). UBS's principal place of business is in this District. The custodial relationship, the account transactions, and the conduct giving rise to this action were centered in or directed from this District.

**FACTUAL ALLEGATIONS**

**A. The Trust and Plaintiff's Vested Interest**

13. Jane Casey Hughes, the settlor, created the Jane Casey Hughes Revocable Trust. Section V of the Trust directs that upon the settlor's death the trustee "shall dispose of the remaining trust assets" to the settlor's three children "outright and free of trust." The word "shall" is mandatory. The Trust does not authorize the trustee to withhold distributions pending litigation, to charge a beneficiary's share for litigation costs, or to delay distribution indefinitely. (Ex. A.)

14. Jane Casey Hughes died on February 1, 2025. (Ex. M.) Upon her death, Plaintiff's one-third residuary interest vested by operation of the Trust instrument. Plaintiff became immediately entitled to outright distribution of one-third of the Trust's residuary assets.

15. More than nineteen months after the settlor's death, Plaintiff has received zero dollars.

**B. The Pre-Death Transfer — Conflicted, Unauthorized, and Concealed**

16. In January 2025 — while the settlor was still alive and within weeks of her death on February 1, 2025 — the trustee, Carolina Reid, caused approximately $7 million of the settlor's assets to be transferred from Charles Schwab, where they had been managed for thirty-five years by the same advisor, Mark Johannessen, to UBS. Mr. Johannessen opposed the transfer. The transfer was made under a power of attorney and was inconsistent with the standard governing management of the settlor's assets during her lifetime.

17. The destination was not neutral. UBS is the employer of the trustee's own daughter, Violet Reid. Violet Reid is also the successor attorney-in-fact named in the September 26, 2022 durable power of attorney executed by the settlor. That power of attorney contains no self-dealing waiver. (Ex. B.) Transferring a dying settlor's assets, over her longtime advisor's objection, into the institution that employs the fiduciary's own child is self-dealing on its face.

18. UBS accepted the transfer and the custodial relationship without any documented conflicts review, notwithstanding that its own employee was the successor attorney-in-fact and the trustee's daughter. UBS never disclosed the conflict to Plaintiff or to any other beneficiary.

**C. Over Eleven Months of Non-Distribution on Unfrozen Accounts**

19. From February 1, 2025 — the date of the settlor's death and the date Plaintiff's inheritance vested — through approximately January 2026, the Trust accounts at UBS sat entirely unfrozen and unrestricted. During those eleven months, the trustee distributed not one dollar to Plaintiff, not one dollar to any residuary beneficiary, and not one dollar of the mandatory outright distribution required by Section V of the Trust.

20. This is the foundational fact of this case. The accounts were open. The money was there. The Trust mandated distribution. The trustee distributed nothing.

21. Carolina Reid told Plaintiff repeatedly, before and after the settlor's death, that she would never give him one cent. She refused to provide him a copy of the Trust instrument, which he was required to obtain indirectly. She told him he was entitled to nothing. Her conduct after the settlor's death was consistent with those statements.

**D. The Hidden Liquidation and Six Ghost Accounts**

22. On August 29, 2025, UBS liquidated the Trust's entire long-held equity portfolio in a single event, recognizing $473,533.05 in avoidable capital gains. (Ex. C.) An in-kind distribution — the method mandated by the Trust's outright distribution language — would not have triggered these gains. No best-interest analysis or tax-efficiency review has been produced. The tax consequence was severe: UBS issued a check for $467,719.27 to the DC Office of Tax and Revenue on November 24, 2025, drawn from Trust account XX-XXX82-1 — a payment that consumed nearly half a million dollars of Trust corpus that belonged in part to Plaintiff. (Ex. V.)

23. On October 29, 2025 — more than two months after the liquidation — Carolina Reid's lawyers were in active negotiations with Plaintiff's then-attorney, Jason Colby. At no point during those negotiations did the trustee's counsel disclose that the entire portfolio had been liquidated. At no point did they disclose what had happened to the proceeds.

24. On that same day, October 29, 2025, at the trustee's direction and without notice to or authorization from Plaintiff, UBS fragmented the single trust account into six separate accounts, bearing numbers ending 882, 999, 998, 997, 343, and 001, under UBS Reference No. 43772714-2025-1115 (the "Accounts"). (Ex. E.) These six accounts were never disclosed to Plaintiff or to his counsel.

25. On that same day, October 29, 2025, UBS wired $70,582.79 of Trust corpus directly to Offit Kurman, P.A. — the trustee's litigation counsel — from the newly fragmented accounts. (Ex. D.) This payment funded the defense of litigation brought by Plaintiff to enforce his own

inheritance rights. It was made from assets in which Plaintiff holds a vested one-third interest. It was never disclosed.

26. To maintain the concealment, the trustee's counsel provided Plaintiff's attorney with an accounting covering only through June 30, 2025 — a document that was already three months stale when delivered, and that predated the August 29 liquidation, the October 29 fragmentation, the October 29 wire to Offit Kurman, and the November 24 estate tax payment by months. The stale accounting was used to keep the subterfuge intact while negotiations continued.

27. Plaintiff discovered the liquidation and the six ghost accounts not through disclosure but because information about them leaked through exhibits that Offit Kurman inadvertently included in court filings.

**E. The Manufactured Freeze and the Forged Freeze Letter**

28. Approximately one year after the settlor's death, having received nothing, Plaintiff contacted UBS and stated his intention to litigate and seek Carolina Reid's removal as trustee. Within weeks — in mid-January to early February 2026 — UBS froze the Trust accounts and notified Plaintiff by FedEx.

29. Notably, the UBS Reference No. assigned to the freeze — 43772714-2025-1115 — encodes a date of November 15, 2025. This indicates that UBS had the Trust accounts under some form of internal review as early as November 15, 2025 — weeks before Plaintiff contacted UBS and months before the public freeze.

30. Within days of the freeze becoming operative, the trustee's lawyers filed verified pleadings in the Circuit Court for Montgomery County, Maryland. In her Petition for Assumption of Jurisdiction of Trust (C-15-CV-26-000381), filed January 21, 2026 — the same day the forged freeze letter was filed — Carolina Reid swore under penalty of perjury at paragraph 34: "UBS has frozen the Trust accounts based upon the wholly baseless allegations of the Injunction Motion" and that this was "preventing the Trustee from . . . making any distributions to beneficiaries." (Ex. X, ¶34.)

31. That sworn statement is false on its face. The trustee's own timeline refutes it. The non-distribution began February 1, 2025 — eleven months before the freeze. Accounts that were never frozen for over eleven months, on which the trustee voluntarily distributed nothing, did not become non-distributing because of a freeze that had existed for days. The freeze did not cause the non-distribution. The non-distribution existed independently, for over eleven months, and the freeze narrative was constructed to excuse it retroactively and to shift blame to Plaintiff.

32. To support that false narrative, the trustee filed an undated letter on UBS letterhead — purportedly from UBS's Subpoenas, Levies and Garnishments Group, bearing UBS Reference No. 43772714-2025-1115 — as Exhibit 19 to her verified Petition. The letter states that "UBS Financial Services Inc. has restricted access to the above-referenced accounts" due to "notification of a pending legal matter." The letter bears no date on its face. No individual signed it. A genuine institutional compliance letter issued by a bank in the ordinary course of business does not omit a date. (Ex. I; Ex. X, Ex. 19.)

33. The trustee filed the same letter in the DC Superior Court Probate Division (Matter No. 2025-ADM-000669) as Exhibit 19 to her verified Motion to Dismiss, with the same sworn statement that Plaintiff caused the freeze and that "the costs of his unjustified proceedings can be apportioned solely to his share." The same letter appears in the federal action (D. Md., No. 8:26-cv-00910-TDC). (Exs. H, I, J.)

**F. Forensic Proof: The Letter Was Made at Offit Kurman, Not at UBS**

34. David K. Shelton, a licensed North Carolina forensic document examiner holding NC PI License No. 3578, NC Digital Forensic Examiner License No. 856981, and NC CI License No. 175, independently accessed the Maryland Electronic Courts system and downloaded both versions of the freeze letter filed of record. His report, dated July 30, 2026, concludes that both versions of the letter are not authentic and were copied or modified from another document. (Ex. Q.)

35. The version filed January 21, 2026 (Supporting Exhibit 19) was created using Aspose.PDF for .NET 21.1 — a third-party developer library for programmatic PDF manipulation, not a UBS institutional document system. Its metadata shows a creation date of January 7, 2026 at 3:17 PM — after the date the letter purports to reflect — and a last-modified date of January 21, 2026 at 8:48 PM, more than seven hours after the 9:30 AM filing stamp on that date. It bears no author. (Ex. Q.)

36. The version filed April 22, 2026 (Supporting Exhibit 1) was created in Microsoft Word for Microsoft 365. Its metadata identifies the author as "Purdie, Terry" — a legal assistant at

Offit Kurman, P.A., the trustee's own law firm. Its creation date is January 16, 2026. No version of the letter, in any court filing, bears a UBS author. (Ex. Q.) Offit Kurman's own counsel acknowledged in a sworn court filing that "Terry Purdie was a Legal Assistant with the firm and handled the administrative side of filing," while attributing the metadata anomalies to "changes inherent in the MDEC filing process." (Ex. W, Footnote 1.) That explanation is forensically impossible: Examiner Shelton's report establishes to a reasonable degree of professional certainty that MDEC does not rewrite document authorship fields, reset creation dates, or alter PDF producer metadata, and that the metadata signatures present in every filed version of the freeze letter are consistent only with original creation of the document at Offit Kurman using Microsoft Word for Microsoft 365. (Ex. Q.)

37. The forensic control that forecloses any innocent explanation is provided by the Liz Small letter (Riker Danzig LLP, April 8, 2026), filed as Supporting Exhibit 3 in the same April 22, 2026 filing. Examiner Shelton found that document to be an original authentic document. Its metadata identifies its author as "Liz Small," its creation date as April 8, 2026 — identical to the date on the letter's face — and it bears no modification. (Ex. Q.) The identical MDEC filing process that preserved "Liz Small" as the authentic author of her letter preserved "Purdie, Terry" as the author of the freeze letter — because that is who created it. Offit Kurman's own counsel, after Plaintiff raised the metadata issue, claimed in a sworn filing that "the metadata reflects changes inherent in the MDEC filing process" and that "Terry Purdie was a Legal Assistant with the firm and handled the administrative side of filing." (Ex. W, Footnote 1.) The Liz Small control document destroys both claims simultaneously: MDEC did not alter her authorship, and a legal assistant's role as "administrative filer" does not make him the author of a document he did not create.

38. The sequence is complete and unambiguous: Offit Kurman created an undated letter on UBS letterhead; filed it in three courts as genuine UBS correspondence; and used it to swear, under penalty of perjury, that Plaintiff caused a freeze that — on the trustee's own eleven-month

**G. UBS's Actual, Documented Notice**

39. Plaintiff placed UBS on detailed written notice of the forgery on April 27, 2026, in a compliance notice sent to multiple UBS legal and compliance addresses. That notice identified by name the specific FINRA rules implicated (Rules 2165, 3110, 3270, 2150, 4511, and 2010), the BSA obligations, and SEC Rules 17a-3 and 17a-4. It identified Author = "Purdie, Terry," the January 16, 2026 creation date, and the Microsoft Word origin of the document. It demanded that UBS reconcile its internal records before acting on any court order relying on the freeze letter, stating: "UBS's internal records will not match the document filed in court because the document was not created at UBS." It also notified UBS of the Violet Reid conflict of interest and the regulatory exposure arising from the conflicted transfer, the liquidation, and the wire to Offit Kurman. (Ex. U.)

40. On July 30, 2026, Plaintiff transmitted Examiner Shelton's sworn forensic report to UBS. UBS acknowledged receipt. (Ex. Q.)

41. Despite this notice — received three months before the proposed release — UBS has neither verified nor disavowed the freeze letter. UBS has produced no evidence that it issued any genuine communication bearing Reference No. 43772714-2025-1115. UBS has not reconciled its internal records with the document filed in court. Instead, UBS's counsel wrote on July 26, 2026 that "UBS intends to follow the Order directed to it" — an order obtained entirely on the strength of a document UBS did not author and has refused to authenticate. (Ex. S.)

**H. The Trustee's Declared Intent to Consume Plaintiff's Share**

42. In her Motion to Specially Assign (filed July 2, 2026), the trustee stated that she "will be seeking Court authority to equitably adjust Dr. Kuczynski's residuary share of the trust for the litigation," that "the Trust cannot reasonably make distributions to the residuary beneficiaries" until a final accounting is approved, and that "it is not expected that this matter will be readily resolved." (Ex. T, ¶¶ 8–9.)

43. The trustee has already paid $70,582.79 of Trust corpus — including Plaintiff's vested share — directly to her own litigation counsel in a single wire transfer on October 29, 2025. She has paid an additional $467,719.27 in estate taxes generated by her own unauthorized liquidation. She proposes to litigate indefinitely, fund that litigation from the corpus, and then charge the entire cost to Plaintiff's share — a self-consuming mechanism that ends with Plaintiff's inheritance extinguished.

**I. The Imminent Release**

44. On July 24, 2026, the Circuit Court for Montgomery County, Maryland signed an order directing UBS to lift the restrictions on the Accounts — relief obtained on the strength of the narrative built atop the fabricated freeze letter, before a judge who stated on the record that "the reason why it was frozen really is immaterial." (Ex. R.)

45. On July 26, 2026, UBS's counsel, Gordon Rees Scully Mansukhani, LLP, confirmed in writing: "UBS intends to follow the Order directed to it." (Ex. S.) Release is not a risk — it is a stated intention. The moment UBS releases the funds, approximately $9 million passes to a

trustee who has sworn to consume Plaintiff's share and who manufactured the instrument that procured the release order.

## CAUSES OF ACTION

### COUNT I — CONVERSION

46. Plaintiff repeats and realleges paragraphs 1 through 45.

47. Plaintiff holds a vested one-third equitable ownership interest in the specific, identifiable fund held in the Accounts — approximately $3 million of approximately $9 million.

48. UBS has exercised dominion and control over that identifiable interest adverse to Plaintiff's rights by: accepting a conflicted transfer without conflicts review; executing a tax-inefficient liquidation without authorization; fragmenting the account into six undisclosed accounts; wiring Trust corpus to the trustee's litigation counsel; paying estate taxes generated by the trustee's own unauthorized liquidation; and now proposing to release the entire fund to a trustee who has declared her intent to extinguish Plaintiff's share — with full knowledge, confirmed in writing, that the instrument procuring the release order is not authentic.

49. These acts constitute conversion of Plaintiff's identifiable property interest. Plaintiff has been damaged in an amount of not less than $3 million, plus consequential damages including $473,533.05 in avoidable capital gains taxes and $70,582.79 in unauthorized payments to the trustee's litigation counsel.

## COUNT II — BREACH OF CUSTODIAL DUTY

50. Plaintiff repeats and realleges paragraphs 1 through 45.

51. As a registered broker-dealer and investment adviser serving as custodian of Trust assets in which Plaintiff holds a vested beneficial interest, UBS owed duties of reasonable care, loyalty, and compliance with applicable broker-dealer and fiduciary standards in the acceptance, custody, management, and disposition of those assets.

52. UBS breached those duties by: accepting the conflicted pre-death transfer without any documented conflicts review under a power of attorney naming its own employee as successor fiduciary; executing the August 29, 2025 single-event liquidation generating $473,533.05 in avoidable capital gains without a best-interest analysis; fragmenting the account into six accounts without disclosed purpose; wiring $70,582.79 of Trust corpus to the trustee's litigation counsel without authorization from or notice to Plaintiff; paying $467,719.27 in estate taxes from Trust corpus; and failing to verify or disavow the fabricated freeze letter despite detailed written notice of the authenticity dispute since April 27, 2026, including transmission of a sworn forensic examiner's report on July 30, 2026.

53. Plaintiff has been damaged by these breaches in an amount to be determined at trial, including but not limited to $473,533.05 in avoidable capital gains taxes, $70,582.79 in unauthorized fee payments, and the prospective loss of his entire one-third residuary share.

## COUNT III — AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

54. Plaintiff repeats and realleges paragraphs 1 through 45.

55. The trustee, Carolina Reid, owed Plaintiff fiduciary duties as a trust beneficiary, including the duties of loyalty, impartiality, and mandatory outright distribution under Section V of the Trust instrument.

56. The trustee breached those duties by: making an unauthorized pre-death transfer of the settlor's assets to the institution that employs her own daughter, without authorization; failing to make any distribution for nineteen months — eleven months on fully unrestricted accounts before any freeze existed, and eight additional months during a freeze maintained by a fabricated instrument — in violation of the mandatory distribution language of the Trust; concealing the August 29, 2025 liquidation from Plaintiff and his counsel; concealing the creation of six undisclosed accounts; providing a stale, three-months-old accounting to Plaintiff's counsel to maintain that concealment; manufacturing and filing a fabricated freeze letter in three courts under oath to blame Plaintiff for eleven months of non-distribution that preceded the freeze; paying Trust corpus to her own litigation counsel; and declaring her intent to charge Plaintiff's entire residuary share for the litigation she provoked.

57. UBS had actual knowledge of facts sufficient to put it on notice of the trustee's breaches, including: the conflict of interest arising from Violet Reid's employment at UBS and her role as successor attorney-in-fact, known to UBS at the time of the January 2025 transfer; the absence of any documented conflicts review; the fragmentation of the account and same-day wire to the trustee's counsel on October 29, 2025; and detailed written notice since April 27, 2026

identifying every specific regulatory violation and the forensic evidence of the fabricated freeze letter.

58. UBS provided substantial assistance to the trustee's breaches by accepting the conflicted transfer, executing the unauthorized liquidation, fragmenting the account, wiring Trust corpus to the trustee's counsel, and now proposing to release the entire fund on the authority of a document it did not author and has refused to authenticate, with full knowledge of the forgery.

59. Plaintiff has been damaged by UBS's aiding and abetting in an amount to be determined at trial.

## COUNT IV — CONSTRUCTIVE TRUST

60. Plaintiff repeats and realleges paragraphs 1 through 45.

61. Plaintiff holds a vested equitable ownership interest in one-third of the Trust's residuary assets, now held in the Accounts at UBS. UBS holds those assets subject to equitable obligations running to Plaintiff as a beneficial owner. If UBS releases the funds to the trustee who has sworn to consume Plaintiff's share, equity requires imposition of a constructive trust on the released funds for Plaintiff's benefit.

## COUNT V — ACCOUNTING

62. Plaintiff repeats and realleges paragraphs 1 through 45.

63. Plaintiff is entitled to a full accounting from UBS of all transactions affecting the Trust's assets held in UBS's custody, including the pre-death transfer, the August 2025 liquidation, the October 2025 fragmentation into six accounts, the wire to Offit Kurman, the November 2025 estate tax payment, and all fees, charges, and disbursements from the Accounts from January 2025 to the present.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff John-Michael Kuczynski, Ph.D., respectfully requests that this Court enter judgment:

a. Awarding compensatory damages against UBS in an amount to be determined at trial, but not less than $3 million;

b. Imposing a constructive trust on the assets held in the Accounts, or any proceeds thereof, for the benefit of Plaintiff;

c. Ordering a full accounting of all transactions affecting the Trust assets in UBS's custody from January 2025 to present;

d. Awarding punitive damages in an amount to be determined at trial;

e. Granting preliminary and permanent injunctive relief preserving the status quo of the Accounts pending final adjudication;

f.   Awarding Plaintiff his costs and such other and further relief as this Court deems just and

proper.

**VERIFICATION**

I, John-Michael Kuczynski, Ph.D., declare under penalty of perjury under 28 U.S.C. § 1746

that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on August 1, 2026, in Fayetteville, North Carolina.

Respectfully submitted,

/s/ John-Michael Kuczynski

_____

John-Michael Kuczynski, Ph.D.
Pro Se Plaintiff
746 Stoney Point Road
Fayetteville, NC 28304
jmkuczynski@yahoo.com
845-240-4235